UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALAN WILSON LUMSDEN,

    Petitioner,

    v.

WILLIE SMITH,

    Respondent.[1]

                                    /

CASE NO. 2:06-CV-14966
JUDGE ARTHUR J. TARNOW
MAGISTRATE JUDGE PAUL J. KOMIVES

# REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION .................................................................. 1
II.   REPORT .............................................................................................. 1
    A.    *Procedural History* ................................................................. 1
    B.    *Factual Background Underlying Petitioner's Conviction* ...................... 4
    C.    *Procedural Matters* ............................................................... 6
        1.    *Concurrent Sentence Doctrine* ................................................. 6
        2.    *Statute of Limitations* ........................................................ 8
        3.    *Procedural Default* ........................................................... 10
    D.    *Standard of Review* ............................................................ 11
    E.    *Analysis* ............................................................................. 13
        1.    *Clearly Established Law* .................................................... 13
        2.    *Analysis* ......................................................................... 14
    F.    *Conclusion* ......................................................................... 19
III.  NOTICE TO PARTIES REGARDING OBJECTIONS ........................................ 19

\*    \*    \*    \*    \*

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.   REPORT:

A.    *Procedural History*

---

[1]By Order entered this date, Willie Smith has been substituted in place of Mary K. Berghuis as the proper respondent in this action.

1.  Petitioner Alan Wilson Lumsden is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan.

2.  On May 22, 1986, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316; and armed robbery, MICH. COMP. LAWS § 750.529, following a jury trial in the Washtenaw County Circuit Court. On June 27, 1986, he was sentenced to a term of 60-90 years' imprisonment on the armed robbery conviction, and to a mandatory term of life imprisonment without parole on the murder conviction.

3.  Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims: (1) unlawful arrest; (2) improper admission of his statement taken in violation of his right to a prompt arraignment and his privilege against self-incrimination; (3) improper admission of evidence that he had committed other homicides; and (4) double jeopardy. The court of appeals agreed that petitioner's conviction of both felony murder and the underlying armed robbery violated his right to be free from double jeopardy, and vacated his armed robbery conviction and sentence. The court rejected petitioner's remaining claims, and affirmed his murder conviction. *See People v. Lumsden*, 168 Mich. App. 286, 423 N.W.2d 645 (1988).

4.  Petitioner sought leave to appeal these issues–except the double jeopardy issue–to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order.

5.  On August 15, 1990, petitioner filed an application for the writ of habeas corpus challenging his conviction. That petition was denied on April 29, 1991. *See Lumsden v. Jabe*, No. 90-CV-72436 (E.D. Mich.).

6.  On May 29, 1991, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508. The trial court denied his motion, and the Michigan Court of

2

Appeals and Michigan Supreme Court denied his applications for leave to appeal in standard orders.

7. According to petitioner, on September 29, 2003, he discovered evidence that had been suppressed by the prosecution, namely, a police report that Rodney Crawford, a codefendant, had confessed to a witness and Detective Stamper that he killed the victim. On October 28, 2003, petitioner filed a second motion for relief from judgment in the trial court raising numerous claims, including a claim that he was denied his right to a fair trial by the prosecutor's suppression of Detective Stamper's report. The trial court denied the motion on December 1, 2003. *See People v. Lumsden*, No. 85-19806-FC (Washtenaw County, Mich., Cir. Ct. Dec. 1, 2003). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *See People v. Lumsden*, 472 Mich. 917, 696 N.W.2d 718 (2005); *People v. Lumsden*, No. 255062 (Mich. Ct. App. Aug. 20, 2004).

8. Pursuant to 28 U.S.C. § 2244(b), petitioner sought authorization to file a second habeas petition challenging his felony murder conviction. On October 31, 2006, the Sixth Circuit granted petitioner authorization to file his current petition. *See In re Lumsden*, No. 06-1448 (6th Cir. Oct. 31, 2006.

9. On November 3, 2006, petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus in accordance with the Sixth Circuit's authorization. Petitioner raises a single claim: that he was denied his right to a fair trial by the prosecutor's suppression of exculpatory evidence.

10. Respondent filed his answer on April 16, 2007. He contends that petitioner's claim is barred by petitioner's procedural default and the statute of limitations; that the Court should decline to entertain the claim under the concurrent sentence doctrine; and that the claim is without merit.

11. Petitioner filed a reply to respondent's answer on September 5, 2007.

B. *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized by the Michigan Court of Appeals on petitioner's direct appeal:

> During the early morning hours of September 22, 1985, James Visel, a reputed drug dealer, was robbed and killed by three assailants at his home in Ypsilanti, Michigan. The assailants took Visel's jewelry and stock of drugs before murdering him execution-style (i.e., shot in the back of the head at close range, while kneeling with hands tied behind his back).
> The next evening (September 23) at 9:30 p.m., Detective Joe Hall of the Washtenaw County Sheriff's Department received an anonymous call from a man who identified defendant as one of the assailants. When asked how he knew this, the caller said, "Well, you just follow it up. You'll find out it's true." The caller went on to say that defendant drove a red or maroon pickup truck, model year 1982 or 1983; that defendant could be found at one of three addresses in Washtenaw County; and that defendant possessed a sawed-off shotgun and a pistol, both loaded, which he would not hesitate to use. The caller did not reveal the source of the information and Detective Hall admitted that, at the time, he had no way of determining its reliability.
> On the basis of this information, a stakeout was organized that night. Each of the addresses provided by the caller was placed under surveillance using unmarked vehicles. As Detective Hall and two other officers were making a final check of an address on Pearl Street, they noticed a red Ford pickup truck parked in the driveway. The truck was occupied by a white male. They suspected this to be defendant since an earlier LEIN check of all vehicles owned by defendant revealed that he owned a red 1983 Ford pickup truck. After they watched the truck for a few minutes, it pulled out of the driveway.
>
> As defendant drove past the officers, they were able to observe his license plate number. A check of the number indicated that the truck did indeed belong to defendant. The officers followed defendant for a brief time when he began picking up speed. When defendant ran a red light or stop sign, back-up assistance was summoned. Soon, other police cars-marked and unmarked-joined the chase. The marked car had its emergency lights and sirens activated. The vehicles raced along for about two miles, reaching speeds of up to eighty-five mph. Then, the truck veered sharply left into the oncoming traffic, jumped the curb, flew over a wide ditch and through a fence, flipped over two or three times, and finally came to rest in a cornfield. Before the police could reach the truck, defendant, who was apparently unharmed, fled into the field. One officer observed a .22 caliber handgun underneath the driver's seat of the truck.
> A search of the field was conducted with the aid of several police tracking dogs. After an extensive search, defendant was located and placed under arrest. A

search of his person produced some jewelry belonging to Visel. During a subsequent inventory search of the truck, the police found-in addition to the handgun-a syringe, more of Visel's jewelry, and a 12-gauge sawed-off shotgun.[fn1]

> FN1. Neither the shotgun nor the handgun found in defendant's truck was the instrument used to kill Visel. The murder weapon was subsequently found-also on the basis of an informant's tip-in a field near the I-94 expressway in Wayne County.

Defendant was brought to the police station at approximately 6 a.m. on September 24 and booked on a concealed weapons charge. That charge was later dropped and, in its stead, he was charged with open murder and armed robbery. At the time he was first brought to the station, Detective Hall advised him of his *Miranda* rights and asked whether he would make a statement. Defendant said only that he was tired, had been bitten by the tracking dogs, and wanted to sleep. With this, the interview ended and defendant was allowed to return to his jail cell.

On September 25, at 12:15 p.m., defendant was again brought to the interview room for questioning by Detective Hall. After being advised of his Miranda rights a second time, he purportedly indicated that he understood his rights, wished to waive them, and did not want an attorney present. He then proceeded to tell Detective Hall that he, along with Rodney Crawford and Robin Feldman, drove to Visel's house during the early morning of September 22 with the intent to rob him. They waited outside until Visel returned home and followed him inside. Using electrical cord, they tied up Visel, his teenage daughter, and her friend. They took Visel downstairs where a safe was located and beat him until he disclosed the combination. Defendant and Feldman removed the jewelry, money, and drugs from the safe and took them outside to the truck. Crawford remained inside with Visel. While loading the truck, defendant heard two gunshots and observed Crawford running from the house. Defendant insisted that he had nothing to do with the shooting.

Shortly after making this statement, defendant was taken before a magistrate for arraignment on the weapons charge. The time was 2 p.m. on September 25-approximately thirty-two hours after he was first taken into custody. The next morning, the weapons charge was dropped and he was arraigned on charges of open murder and armed robbery.

Prior to trial, defendant filed a motion for a *Walker* hearing to determine the voluntariness of his confession. He alleged that his statement to the police was involuntary for three reasons: First, defendant was allegedly denied an attorney after requesting one; second, the delay between arrest and arraignment was unreasonable and used to coerce a confession; and third, defendant's injuries and the discomfort suffered at the jail house constituted physical duress. After hearing testimony and arguments on the motion, the trial court denied each of defendant's claims.

Defendant's trial commenced on May 13, 1986, before a jury in the Washtenaw Circuit Court. He was tried on charges of open murder, M.C.L. § 750.316; M.S.A. § 28.548, and armed robbery, M.C.L. § 750.529; M.S.A. § 28.797. On May 22, 1986, at the conclusion of an eight-day trial, the jury pronounced defendant not

guilty of first-degree premeditated murder and second-degree murder, but guilty of felony murder and armed robbery. On June 27, 1986, defendant was sentenced to life imprisonment for the murder conviction and sixty to ninety years imprisonment for the robbery conviction. The sentencing court let stand both of those sentences despite defense counsel's argument that the robbery conviction was subsumed within the felony murder conviction.

*Lumsden*, 168 Mich. App. at 288-92, 423 N.W.2d at 646-48.

C.  *Procedural Matters*

Before turning to the merits of petitioner's claim, the Court must first address the various procedural defenses raised by respondent. Respondent argues that the Court should decline to consider the petition at all under the concurrent sentence doctrine. Additionally, respondent argues that petitioner's claim is barred both by the statute of limitations and by petitioner's procedural default in the state courts. The Court should reject each of these procedural arguments.

1.  *Concurrent Sentence Doctrine*

Respondent argues that the Court should decline to entertain petitioner's challenge to the felony murder conviction under the concurrent sentence doctrine, because petitioner is currently serving life sentences for two other murder convictions. The Court should disagree.

Under the "concurrent sentencing doctrine," a "court may decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction." *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989); *see also*, *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992). The doctrine is a discretionary one, *see Hughes*, 964 F.2d at 541, and courts "are admittedly hesitant to apply this doctrine." *Dale*, 878 F.2d at 935 n.3; *see also*, *Winn v. Renico*, 175 Fed. Appx. 728, 732 (6th Cir. 2006).. The doctrine is applicable only "when there is *no possibility* of adverse 'collateral consequences' if the convictions stand." *Winn*, 175 Fed. Appx. at 732 (emphasis added);

*see also*, *Dale*, 878 F.2d at 935 n.3; *Wilson v. Straub*, 185 F. Supp. 2d 766, 769 (E.D. Mich. 2002) (Hood, J.). The Court should presume that petitioner's conviction carries adverse collateral consequences, *see Wilson*, 185 F. Supp. 2d at 769-70 (citing *Sibron v. New York*, 392 U.S. 40, 55 (1968)); *see also*, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that the Court generally presumes that a criminal conviction carries adverse collateral consequences beyond the sentence imposed), and respondent bears a heavy "burden of showing that the risk of collateral consequences is too slight to justify review." *Suarez v. Bennett*, 207 Fed. Appx. 114, 115 (2d Cir. 2006). The concurrent sentence doctrine is not jurisdictional–that is, the existence of concurrent sentences does not render a challenge to one sentence moot and therefore outside the Court's jurisdiction. *See United States v. Williams*, 128 S. Ct. 1830, 1838 n.1 (2008); *Benton v. Maryland*, 395 U.S. 784, 791 (1969).

Respondent argues that the Court should apply this doctrine to petitioner's current application for the writ of habeas corpus because he is currently serving two other life sentence for first degree murder. Thus, according to respondent, there are no collateral consequences flowing from the current conviction being challenged in petitioner's application. The Court should disagree. As noted in *Dale*, there must be "*no* possibility of adverse 'collateral consequences'" before the concurrent sentencing doctrine will be applied. *Dale*, 878 F.2d at n.3 (emphasis added). Here, it cannot be said that there is *no* possibility of adverse consequences. There is a possibility, however slight, that petitioner's first degree murder and other convictions not challenged here will no longer result in his imprisonment. For example, although it seems unlikely, these convictions may be overturned in state postconviction proceedings, or by a federal court through a writ of habeas corpus or a writ of error corum nobis. Likewise, although petitioner's convictions do not permit the possibility of parole, the governor still has authority to commute the sentences or pardon petitioner.

Prior to adoption of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996), such slight possibilities of collateral consequences could be adequately accounted for by dismissing the petition pursuant to the concurrent sentencing doctrine, but making such a dismissal without prejudice to the petitioner refiling his application should the unlikely collateral consequences occur. For example, this was the course taken by the court in *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991). However, even if this Court were to take the approach of the *Scott* court, application of the concurrent sentencing doctrine to petitioner's application will have the effect of forever precluding petitioner from challenging this conviction, even if the life sentence is commuted or otherwise becomes invalid, due to the one year limitations period of the AEDPA. 28 U.S.C. § 2244(d)(1). Accordingly, the Court should decline respondent's invitation to apply the concurrent sentence doctrine.

2. *Statute of Limitations*

Respondent also argues that petitioner's claim is barred by the statute of limitations. On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1220 (Apr. 24, 1996). In relevant part, the AEDPA amended 28 U.S.C. § 2244 to provide a one year statute of limitations for habeas petitions. Specifically, the statute as amended by the AEDPA provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
> (A) the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized

by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).[2]

There is no question that petitioner's application is untimely under § 2244(d)(1)(A). However, petitioner contends that the limitations period should not begin to run until September 9, 2003, the date on which he discovered the allegedly suppressed police report, under either subparagraph (B) or (D). Respondent contends, reiterating his argument on the merits of petitioner's claim, that petitioner should have discovered the existence of Diane Auten well before September 9, 2003, and thus that these provisions are inapplicable. Regardless of the merit of this argument with respect to the substantive question of whether the police report detailing Auten's statement was "suppressed," this argument misses the mark with respect to the timeliness issue. Even if petitioner should have known of the existence of Auten as a witness before September 9, 2003, he could not have known about the existence of his *Brady* claim prior to discovering the suppressed information. Put another way, the suppressed evidence was not the existence of Auten, but her statement to the police. And respondent has provided no argument as to why Auten's *statement*, as opposed to her mere existence, should have been known to petitioner prior to 2003, particularly in light of the fact that petitioner had requested all *Brady* materials prior to trial and was entitled to rely on the prosecutor's assurances that such material had been provided. *See Banks v. Dretke*, 540 U.S. 668, 693 (2004). In short, petitioner could

---

[2]The AEDPA codified a one-year statute of limitations provision for motions to vacate federal convictions brought under 28 U.S.C. § 2255 which is nearly identical to the one found in § 2244(d)(1). *See* 28 U.S.C. § 2255 para. 6. Accordingly, cases discussing the § 2255 statute of limitations are applicable here.

not have known of the factual predicate for his *Brady* claim until the suppressed report surfaced, regardless of whether he knew that Auten was a witness. Thus, September 9, 2003, is an appropriate starting date for the limitations period. *See Starns v. Andrews*, 524 F.3d 612, 618-19 (5th Cir. 2008); *cf. Moore v. Knight*, 368 F.3d 936, 938 (7th Cir. 2004). And because respondent does not argue that petitioner's application is untimely if the limitations period commences on this date, the Court should reject respondent's statute of limitations defense.

3.  *Procedural Default*

Finally, respondent contends that petitioner's claim is barred by petitioner's procedural default in the state courts, because petitioner failed to raise this claim on direct appeal. The Court should disagree. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Even were the Court to conclude that petitioner's claims are procedurally default, it is still necessary to consider the claims on the merits. Petitioner can still have his defaulted claims reviewed

on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. The suppression of the police report can itself constitute cause, and whether petitioner was prejudiced turns on whether the report was suppressed within the meaning of *Brady*. Thus, the cause and prejudice inquiry in this case merges with the merits of the claim, and the Court should therefore consider the merits without relying on the procedural default doctrine, a course which the Supreme Court itself has consistently followed in the context of procedurally defaulted *Brady* claims. *See Banks v. Dretke*, 540 U.S. 668, 692-98 (2004); *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

D.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

11

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

12

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.  *Analysis*

In his sole habeas claim, petitioner argues that he was denied a fair trial by the prosecutor's suppression of a police report detailing a statement made by Diane Auten in which she indicated that Rodney Crawford, petitioner's codefendant, admitted to her that he shot the victim. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

  1.  *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three

13

elements. *See Carter*, 218 F.3d at 601. Further, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760,766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence.").

2. *Analysis*

Petitioner's *Brady* claim is based on a report prepared by Detective Stamper in late September or early October 1985,[3] detailing a statement made to him by Diane Auten concerning codefendant Rodney Crawford's role in the murder. In its entirety, the report reads:

> The U/S was contacted by the witness who stated that she just received a call from Rodney Crawford. The witness stated that Rodney told her that he killed James Visel and that he deserved to die. The witness stated that Rodney stated that he was not at the other two meaning the couple in Dearborn. This call was received in the late hours of Friday night or the early morning hours of Saturday Sept. 27 and 28.
> After the first call was received, the U/S was at the residence of the witness at her request because she felt that she might be in danger. At the time the U/S was at the witnesses [sic] residence, a second call was received by the witness. This time Rodney stated that he was not at the scene of the two but he did the other one.
> This witness stated that she received several calls from the suspect Rodney Crawford and at no time did the suspect ever threaten her but she was feared [sic] that the suspect might come to her residence to try and find out where his girl friend might be. The girlfriend of the suspect is the sister of the witness.
> After the second phone call in the early morning hours of Saturday Sept. 28, 1985, there was no other calls made to the witness that morning but there were other calls made later in the same week.
> On Sunday Oct 6, 1985 the day before the suspect was apprehended in Florida, the witness called the U/S and stated that the suspect had just called her again asking the witness to get his girlfriend out of the protective custody at the county jail. This was the last call the suspect made to the witness prior to his apprehension.

---

[3]The report is dated September 28, 1985, but includes information concerning October 6, 1985. Thus, it is not clear if the report was first prepared on September 28 and the later information subsequently added, or whether the report was prepared later but dated September 28 because that is the date the primary information was received. This precise timing question is not relevant to petitioner's claim.

14

Pet., Ex. 1.

In light of the evidence at trial and the prosecution and defense theories, petitioner cannot show that the evidence was material. Under *Brady*, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). Rather, exculpatory "evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *see also*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

Here, there is not a reasonable probability that the result of the proceeding would have been different had petitioner known about Auten's statement to the police because the identity of the shooter was irrelevant to petitioner's guilt. As recently explained by another Judge of this Court:

> To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony. In order to satisfy the malice standard required under *People v. Aaron*, the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm.

*Henderson v. Jones*, No. 06-CV-11083, 2008 WL 1735328, at *6 n.2 (E.D. Mich. Apr. 14, 2008) (Borman, J.). Petitioner was convicted of first degree felony murder based on his role in the robbery. The prosecutor's theory at trial, as reflected in both his opening statement and closing argument, was that it did not matter who actually shot the victim. Rather, all three participants were guilty because the murder was the result of a designed plan to rob and kill the victim, or at a minimum petitioner

participated with knowledge that death or serious bodily harm would result. *See* Trial Tr., dated 5/13/86, at 13-14, 16; *id*. dated 5/21/86, at 22-23, 26-30, 32-33. Petitioner, for his part, never argued that he was not guilty because he did not shoot the victim, nor did he attempt to contradict the prosecution's aiding and abetting theory. Rather, as reflected in defense counsel's closing argument, petitioner's defense was that he simply was not involved in the robbery at all. Counsel's entire closing argument, in fact, was devoted to establishing that petitioner was not involved and that petitioner's statement to the police was untrue and involuntary. *See id*. at 37-86. The jury rejected petitioner's defense and concluded that the prosecution had proved, beyond a reasonable doubt, that petitioner participated in the robbery and had the requisite mental state to be convicted of felony murder. Because the prosecutor did not argue that petitioner was in fact the shooter, and because the identity of the shooter was irrelevant to petitioner's guilt as an aider and abettor, there is not a reasonable probability that the result of the proceeding would have been different had petitioner presented evidence–through Auten's testimony–that Crawford was the actual shooter.

The Ninth Circuit's decision in *Cyprien v. Newlands*, 36 Fed. Appx. 324 (9th Cir. 2002), is on point. In that case, the petitioner claimed that the prosecution suppressed evidence that he could have used to impeach a prosecution witness who testified that the petitioner shot the victim, and that his counsel was ineffective for failing to interview two eyewitnesses who could have testified that a different gang member shot the victim. The court held that, even assuming a *Brady* violation occurred and that counsel was deficient, any error was harmless because

> these violations would only cast doubt on the theory that Cyprien actually shot Whalen. But, Cyprien did not need to have actually shot Whalen to be found guilty of second-degree murder-acting as an aider and abettor was sufficient. Importantly, there is substantial evidence supporting the aiding and abetting theory-including eyewitness testimony that Cyprien signaled the other gang-members to shoot Whalen, and Cyprien's confession that he attended a retaliation meeting where the murder was planned, went to the scene of the murder with the other gang-members, whistled to the

other gang-members to shoot Whalen, and acted as a lookout. As such, because Cyprien cannot establish prejudice to the aiding and abetting theory from these alleged violations, they did not have a substantial and injurious effect or influence in determining the jury's verdict.

*Id*. at 325 (internal quotation omitted). Similarly, in *Chaney v. Brown*, 730 F.2d 1334 (10th Cir. 1984), the court found that FBI reports that had been suppressed which could have raised an inference that the petitioner did not personally commit the murders for which he was convicted, were not material to petitioner's guilt. The court explained that while the nondisclosed evidence supported the inference that the petitioner did not personally commit the murders, "the withheld evidence would not have affected a conclusion that Chaney was involved in the felony of kidnapping during which the murder . . . was committed." *Id*. at 1350. Reviewing the evidence of petitioner's involvement and the relevant aiding and abetting law of Oklahoma, the court concluded that "the withheld evidence would not have affected a determination that Chaney at least was involved by aiding and abetting the kidnapping of [the victim], and liable as a principal for her murder during that felony, even if he did not commit the murder or intend that it occur." *Id*. at 1351.[4]

Also persuasive is Judge Friedman's decision in *Watkins v. Straub*, No. 00-72648, 2007 WL 1098528 (E.D. Mich. Apr. 12, 2007) (Friedman, J., adopting report of Whalen, M.J.). In that case, the petitioner argued that the prosecutor had violated *Brady* by suppressing an autopsy report which

---

[4]Michigan law differs from the Oklahoma law at issue in *Chaney* because under Michigan law felony murder requires a showing of the underlying mental state for murder, *i.e.*, malice aforethought. This distinction does not lessen the persuasiveness of *Chaney*, however, because in petitioner's case there was abundant evidence that all three participants either intended to kill the victim, or acted with reckless disregard with knowledge that the victim's death might occur, sufficient to establish the requisite mental state for murder. Further, the *Chaney* court did conclude that the suppressed evidence was material with respect to the petitioner's death sentence, but only because a death sentence may not be imposed on a defendant who does not himself kill or intend to kill. *See Enmund v. Florida*, 458 U.S. 782 (1982); *see also*, *Chaney*, 730 F.2d at 1350 (explaining that "the possible involvement of others in the kidnapping and murders does not call Chaney's conviction for [the victim's] murder into question under *Enmund*.").

17

contained a handwritten note that one wound to the victim was caused by a .38 caliber bullet. The petitioner argued that this report would have contradicted the prosecutor's theory that the victim was shot with two separate nine millimeter weapons. The Court concluded that the evidence was not material. The court noted that the trial testimony established in any event that petitioner was armed with a .357 caliber handgun, not a nine millimeter handgun, and that the prosecutor's theory was that petitioner and his two codefendants were all guilty because they all fired into the car in which the victim was killed, regardless of who actually fired the fatal shot. The court reasoned that, based on the evidence and the prosecutor's theory of the case, the suppressed evidence was not material:

> Regardless of whether he was armed with a .357 or a nine millimeter-or with a .38 or a .22-the Petitioner admitted to the police that he shot twice at Wilbert's car. The Petitioner's statement was corroborated by Payne's testimony that just before the shooting, Petitioner got out of the car with the other two men, and by Wilbert's testimony that the three men stood in a triangle pattern around his car, and shots came "from all sides." Contrary to the Petitioner's argument, the prosecutor's theory of guilt in no way depended on what type of gun he had or with whose gun Johnson was actually shot. Rather, the prosecutor's theory, which was well-supported by the evidence, was that Petitioner was guilty as an aider and abettor.
> Accordingly, the reference in the autopsy report to a .38 caliber bullet had no bearing on Petitioner's guilt as an aider and abettor, and was not material under Brady.

*Id*. at *8.

Here, as in *Cyprien*, *Brown*, and *Watkins*, the actual identity of the shooter was not material to the question of petitioner's guilt as an aider and abettor. The evidence showed that the perpetrators tied up the victim and beat him to obtain information regarding his drug business and to obtain the location of his valuables. There was also evidence that the perpetrators were armed with guns, and that petitioner knew of Crawford's propensity for violence. At a minimum, there was ample evidence that even if all three perpetrators did not intend to kill the victim, they intended to inflict great bodily harm or acted with reckless disregard for whether death or great bodily harm would result when they aided and abetted each other in the crime. This was more than sufficient to find each perpetrator

18

guilty of felony murder on an aiding and abetting theory. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 858-59 (E.D. Mich. 2003) (Tarnow, J.); *Terry v. Bock*, 208 F. Supp. 2d 780, 795 (E.D. Mich. 2002) (Gadola, J.). And, there was ample evidence–most notably his own statement–that petitioner was one of the perpetrators. Thus, as in the cases discussed above, evidence that Crawford was the person who actually committed the killing does not cast any doubt on petitioner's guilt as an aider and abettor, and thus the allegedly suppressed evidence was not material under *Brady* and its progeny. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief.

F.  *Conclusion*

In view of the foregoing, the Court should conclude that the allegedly suppressed evidence was not material to petitioner's guilt, and thus that he has failed to establish a due process violation under *Brady*. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives  
PAUL J. KOMIVES  
UNITED STATES MAGISTRATE JUDGE

Dated:7/15/08

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on July 15, 2008.
>
> s/Eddrey Butts  
> Case Manager